UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

                              Criminal Case No. 23-20075

v.                             Honorable Linda V. Parker

KENYODA LAKEITH HOLMES,

     Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Defendant Kenyoda Lakeith Holmes is charged in an Indictment with one count of Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1). The matter is presently before the Court on Mr. Holmes' motion to suppress evidence in which he argues that City of Detroit police officers unlawfully seized him and the firearm from his pants pocket.[1] (ECF No. 26.) The Court conducted an evidentiary hearing with respect to the motion on May 11, 2023. For the following reasons, the Court denies the motion.

_____

[1] Mr. Holmes also has filed a motion to dismiss the Indictment on Second Amendment grounds. (ECF No. 23.) The Court will address that motion separately.

## Background

On August 14, 2022, City of Detroit police officers Aljic and Thompson were dispatched to the address of a Detroit laundromat to respond to a felonious assault in progress.  The dispatcher informed the officers that a Black female, wearing a black dress with "PUMA" on it, had a gun, was waving it around, and had threatened an unknown male with the weapon.  The dispatcher also informed the officers that the woman was driving a black Ford Fusion.  The dashboard camera in the officers' patrol car and then Officer Aljic's body camera recorded their response and Mr. Holmes' subsequent arrest.

Within minutes, the officers arrived at the scene and located a Black female wearing a "PUMA" dress near the driver's side door of a Ford Fusion in the parking lot.  (Gov't Ex. 1 at 2:02-2:11.)  A male, Mr. Holmes, was standing next to the open passenger side door of the vehicle.  (*Id.*)  Mr. Holmes was wearing a short sleeve t-shirt and track pants with side-slit pockets.  (*Id.*)  Officer Aljic testified that neither the woman nor Mr. Holmes were holding a weapon and a weapon was not detected on the woman, whose dress was form fitting.

The officers approached the vehicle and asked the woman and Mr. Holmes to step to the rear of the vehicle, where Officer Aljic walked.  (Gov't Ex. 1 at 2:11-2:21.)  Officer Thompson began looking inside the Fusion.  As Mr. Holmes stepped toward the back of the vehicle and Officer Aljic, Mr. Holmes' right side

was away from the officer. (*Id*. at 2:21-2:26.)  Mr. Holmes remained in that

position while talking to Officer Aljic.  (*Id*. at 2:26-3:00.)

Officer Aljic testified that, based on his training and experience as a patrol

officer for approximately three years, he believed Mr. Holmes was intentionally

keeping his right side concealed because he was holding contraband or a weapon

somewhere on that side of his body.  As the dispatcher reported the presence of a

firearm, Officer Aljic believed Mr. Holmes might be concealing the weapon.

Officer Aljic attempted to investigate further by placing himself where he could

visually see Mr. Holmes' right side.  (*Id*. at 3:00.)  However, in response, Mr.

Holmes moved to a position where his right side remained concealed.  (*Id*. at 3:02.)

Officer Aljic testified that he was able to see an L-shaped object in the right-

side pocket of Mr. Holmes' pants, which he knew from experience was a firearm.

Officer Aljic testified that he also could see the butt of the gun.  It was unclear

from Officer Aljic's testimony whether he saw the butt of the weapon sticking out

of Mr. Holmes' pocket or if the butt simply was distinguishable on the shape he

saw inside Mr. Holmes' pocket.  In the video, there does appear to be a bulge in

the right pocket of Mr. Holmes' pants. (*See, e.g., id.* at 2:22, 3:13.)

Officer Aljic then put his left hand on Mr. Holmes right wrist and asked Mr.

Holmes to turn around.  (*Id*. at 3:17.)  Mr. Holmes pulled his arm away, asked

Officer Aljic why he was grabbing him, and then, while stepping back away from

the officer, complained that the officer had no reason to grab him.  (*Id*. at 3:17-

3:25.)  Officer Aljic placed Mr. Holmes in what Officer Aljic described as a "bear

hug" and pinned Mr. Holmes against the vehicle.  (*Id*. at 3:28-3:34.)  By this point,

Officer Thompson had approached, and each officer held one of Mr. Holmes'

arms.  Officer Thompson then felt the outside of Mr. Holmes' pocket and indicated

that the object was a gun.  (*Id*. at 3:34-3:42.)  The officers proceeded to handcuff

Mr. Holmes and retrieved a bright purple 9 mm firearm from his pocket.  (*Id*. at

3:46-3:59; *see also* ECF Nos. 41-2 to 41-7.)

Mr. Holmes maintains that his initial detention was not supported by

reasonable suspicion and, therefore, he was illegally seized and searched when the

police officers grabbed him and then removed the firearm from his pants pocket.

The Fourth Amendment guards against "unreasonable searches and

seizures."  U.S. Const. amend. IV.  However, as the Supreme Court has indicated,

"not every encounter between a police officer and a citizen is an intrusion requiring

an objective justification."  *United States v. Mendenhall*, 446 U.S. 544, 553 (1980)

(citing *Sibron v. New York*, 392 U.S. 40 (1968)).  In other words, not every

interaction between a police officer and citizen implicates the Fourth Amendment.

*Id*.  There must be a "search" or "seizure" to invoke the Fourth Amendment's

protections and a seizure occurs only when an officer "by means of physical force

4

or show of authority, has in some way restrained the liberty of a citizen[.]" *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).

Courts identify three types of encounters between police officers and citizens:

> (1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause.

*United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997) (citations omitted); *see also United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010) (citations omitted). "In the first type of encounter, law enforcement officers may ask citizens 'general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave.'" *United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008) (quoting *United States v. Waldon*, 206 F.3d 597, 603 (6th Cir. 2000)). "Whether an encounter between a police officer and a citizen is consensual depends on the officer's objective behavior, not on any subjective suspicion of criminal activity." *Id.* (quoting *Waldon*, 206 F.3d at 603).

An investigative detention "follows the framework of *Terry v. Ohio*, 392 U.S. 1 . . . (1968), and its progeny." *Davis*, 514 F.3d at 607. "*Terry* permits a police officer briefly to detain a person or property for investigative purposes if the

officer has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur." *Id.* at 607-08 (quoting *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005)).  The constitutionality of a *Terry* stop is evaluated under a two-part analysis:

> First, [the court] determine[s] whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion.  [The court] examine[s] the totality of the circumstances in order to determine the reasonableness of the investigatory stop.  [The court] may take into consideration the crime level of the area as a contextual consideration.  Also, tips from reliable informants may be used as the basis for a *Terry* stop.  *Adams v. Williams*, 407 U.S. 143, 147 . . . (1972) ("We reject respondent's argument that reasonable cause for a stop and frisk can only be based on the officer's personal observation, rather than on information supplied by another person.").
>
> Second, [the court] examines whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances.  Thus, [the court] must determine (1) if the detention was sufficiently limited in time and (2) if the investigative means used the least intrusive means reasonably available.

*Davis*, 514 F.3d at 608 (cleaned up and additional citations and quotation marks omitted).

The encounter between the officers and Mr. Holmes was consensual at the point when the officers arrived, asked Mr. Holmes and the female to step to the back of the Ford Fusion, and Officer Aljic spoke with them.  *See Florida v.*

6

*Rodriguez*, 469 U.S. 1, 5-6 (1984) (finding that the initial encounter between officers and three men, where the officers asked the men to step aside and talk with the officers was "clearly the sort of consensual encounter that implicates no Fourth Amendment interest"); *United States v. Matthews*, 278 F.3d 560, 562 (6th Cir. 2002) (indicating that simply calling out to someone to come over to talk does not constitute a seizure).  The officers did not display weapons, physically touch Mr. Holmes at this point, or use language or a tone of voice compelling compliance. *See United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009) (quoting *Mendenhall* 446 U.S. at 554) (identifying circumstances indicative of a seizure, including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled").  They did not park the patrol car in a position that blocked the Ford Fusion.  *Id.* (explaining that blocking a suspect's vehicle communicates to a reasonable person occupying the vehicle that the individual is not free to leave).

But even if the initial encounter between the officers and Mr. Holmes and his female companion constituted an investigatory detention, it was supported by "a particularized and objective basis" to reasonably conclude "that criminal activity may [have been] afoot" and that one or both of these individuals was "armed and presently dangerous." *Terry*, 392 U.S. at 30.  The officers were

7

responding to a call from dispatch that a Black female, wearing a Puma dress and driving a Ford Fusion, had threatened an individual at the laundromat with a firearm.  Reasonable suspicion must be particularized.  *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (holding that "a person's mere propinquity to others independently suspected of criminal activity does not, without more give rise to probable cause to search that person); *United States v. Bell*, 762 F.2d 495, 499 (6th Cir. 1985) (rejecting an "automatic companion" rule and indicating that *Terry* requires something more—i.e., reasonable suspicion under the circumstances).  Nevertheless, Mr. Holmes was not a random individual present in the parking lot when the officers arrived.

Instead, when the officers arrived at the scene, they located the woman and Ford Fusion described by dispatch, and Mr. Holmes was preparing to get into the vehicle.  It was apparent to the officers that the female did not have the weapon on her person.  Further, according to Officer Aljic, the woman and Mr. Holmes were acting very nervous.  Under these circumstances, the officers also had reasonable suspicion to stop and question Mr. Holmes.  *See, e.g., Maryland v. Pringle*, 540 U.S. 366, 373 (2003) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 304-05 (1999)) (noting that "a car passenger—unlike the unwitting tavern patron in *Ybarra*—will often be engaged in a common criminal enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their

wrongdoing"); *United States v. Bell*, 762 F.2d 495, (reversing suppression of handgun found on occupant who was the passenger in a parked car when officers were executing arrest warrant for his companion).

As Officer Aljic was speaking with the woman and Mr. Holmes, Mr. Holmes kept his right side away from the officer which, based on Officer Aljic's training and experience, suggested that Mr. Holmes was attempting to conceal contraband or a weapon. When Officer Aljic moved to get a better view of Mr. Holmes' right side, Mr. Holmes shifted his position so that his right side remained away from the officer. While there may have been other explanations for Mr. Holmes' movements, what matters here is whether Officer Aljic's suspicions were reasonable. *See Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990) (explaining that "what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable"); *United States v. Kaplansky*, 42 F.3d 320, 327 (6th Cir.1994) (acknowledging that "[e]ven if the defendant could assert a plausible innocent explanation for his behavior . . . police need not rule out every innocent explanation for suspicious behavior in order to justify an investigatory stop.").

Further, Officer Aljic testified that he detected the shape of a gun in the right pocket of Mr. Holmes' pants and saw the butt of the gun. Although what Officer

Aljic described is not clear in the video from his body camera—which admittedly does not provide the same view the officer had—it does appear from the video that Mr. Holmes is carrying something bulky in the right pocket of his pants.

Under these circumstances, the officers had reasonable suspicion to justify the pat down of Mr. Holmes for a weapon. *See, e.g., United States v. McCallister*, 39 F.4th 368, 376 (6th Cir. 2022) (concluding that officer's frisk of the defendant was justified where he saw both a "bump out" from the suspect's shirt and a firearm magazine in his waistband, the defendant attempted to hide the weapon by turning his body away from the officer, and the officer knew there were frequent shootings at the location); *United States v. McDaniel*, 371 F. App'x 617, 621 (6th Cir. 2010) (holding that the officer had reasonable suspicion that occupant of parked car was armed, where occupant appeared startled, turned his body away, and made a furtive movement as if he was putting something into his waistband); *see also Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Terry*, 392 U.S. at 24) ("*Terry* further held that 'when an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' the officer may conduct a patdown search 'to determine whether the person is in fact carrying a weapon.'"). Once concluding that the item in Mr. Holmes' pocket was a weapon, the officers had probable cause to seize it and arrest Mr. Holmes. *See Dickerson*, 508 U.S. at

375-76 (holding that officers may seize contraband or a weapon detected during a protective patdown search permitted under *Terry* provided the search stays within *Terry*'s bounds).

Therefore, the Court is denying his motion to suppress.

### Conclusion

For the reasons stated, the Court holds that the seizure of the firearm from Mr. Holmes did not violate the Fourth Amendment.

Accordingly,

**IT IS ORDERED** that Defendant's Motion to Suppress Evidence Following Illegal Arrest of Defendant (ECF No. 26) is **DENIED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: June 8, 2023

11